# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| **JOHN CLORITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 14-10399-DJC** |
| | ) | |
| **SOMERSET ACCESS TELEVISION, INC.** | ) | |
| **and THOMAS C. NORTON,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                **September 20, 2016**

## I.    Introduction

Plaintiff John Clorite ("Clorite") has filed this lawsuit against Defendants Somerset Access Television, Inc. ("SATV") and Thomas C. Norton ("Norton") (collectively "Defendants") alleging retaliation pursuant to Mass. Gen. L. c. 151B (Count I) (against both Defendants), retaliation pursuant to the Massachusetts Equal Rights Act, Mass. Gen. L. c. 93, § 102 ("MERA") (Count II) (against both Defendants), defamation (Count III) (against both Defendants), interference with advantageous business or contractual relationships (Count IV) (against Norton only), intentional infliction of emotional distress (Count V) (against both Defendants), violation of freedom of expression rights under the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights (Count VI) (against SATV only) and retaliation under 42 U.S.C. § 1981 (Count VII) (against both Defendants).  D. 14.  Defendants assert counterclaims

against Clorite for breach of fiduciary duty and duty of loyalty (Count I) and breach of confidentiality (Count II).  D. 48.

Defendants have now moved for summary judgment on all remaining counts against them, D. 60, and Clorite moves for summary judgment on Defendants' counterclaims, D. 58.  For the reasons stated below, the Court ALLOWS Defendants' motion for summary judgment and ALLOWS IN PART and DENIES IN PART Clorite's partial motion for summary judgment.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute on any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "carries with it the potential to affect the outcome of the suit under the applicable law."  García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014) (quoting Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014)) (internal quotation mark omitted).

The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact."  Rosciti v. Ins. Co. of Pa., 659 F.3d 92, 96 (1st Cir. 2011) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Once that burden is met, the non-moving party may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "with respect to each issue on which [he] would bear the burden of proof at trial," he must "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (internal quotation mark and citation omitted).  As such, the "factual conflicts" the nonmoving party relies upon "must be both genuine and material."  Gomez v. Stop & Shop Supermarket Co., 670 F.3d

395, 396-97 (1st Cir. 2012). This requires the production of evidence that is "significantly probative," id. at 398 (citation omitted), rather than "merely colorable," DeNovellis, 124 F.3d at 306 (citation omitted).

While the Court views the record in the light most favorable to the non-moving party, drawing reasonable inferences in his favor, "[c]onclusory allegations, improbable inferences, and unsupported speculation" are "insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (internal quotation mark and citation omitted).

## III.   Factual Background

The following facts are drawn from the parties' statements of material facts, D. 59, D. 61; D. 77; D. 82; D. 80; D. 84, and supporting documents and, unless otherwise noted, are undisputed.

### A.   Clorite and SATV

SATV is a non-profit cable access television corporation located in Somerset, Massachusetts. D. 61 ¶ 1; D. 80 ¶ 1. SATV is overseen by its board of directors, led by the board president. D. 61 ¶ 4; D. 80 ¶ 4. According to SATV bylaws, the SATV board consists of a minimum of five and a maximum of seven directors. D. 61 ¶ 3; D. 80 ¶ 3; D. 70-6 at 4 (SATV bylaws). When SATV was first created, the Somerset Board of Selectmen ("Board of Selectmen") chose the SATV board. D. 61 ¶ 3; D. 80 ¶ 3; D. 79-15 at 107:9-108:23 (Norton Dep.); D. 70-6 at 4. Thereafter, two board members, less than a quorum, are appointed by the Board of Selectmen. D. 61 ¶ 3; D. 80 ¶ 3; D. 70-6 at 4. Between 2005 and 2015, Norton was president of SATV's board. D. 61 ¶ 2; D. 80 ¶ 2. Clorite also served on SATV's board from 2009 to 2011 and provided video recording and programming production services. D. 61 ¶ 6; D. 80 ¶ 6; D. 77 ¶ 17; D. 82 ¶ 17.

SATV was previously funded by remittances from Comcast cable subscriber fees as a result of a license between the Town of Somerset and Comcast in addition to occasional public donations. D. 61 ¶ 5; D. 80 ¶ 5.  As of July 2015, the new license with Comcast requires that remittances be paid to the Town of Somerset directly and that SATV presents its budget proposal to the Board of Selectmen to discuss how such funds will be used. D. 61 ¶ 5; D. 80 ¶ 5; D. 79-19 ¶¶ 19-20 (LeBeau Aff.).

Clorite observed that around January 2010 SATV's executive director, Joanne Breault ("Breault"), was being sexually harassed by Norton. D. 61 ¶ 16; D. 80 ¶ 16; D. 59 ¶ 7; D. 77 ¶ 7. Breault asked Clorite to keep the situation confidential and to take no action regarding the alleged harassment.  D. 77 ¶ 20; D. 82 ¶ 20.  The parties dispute whether Norton received a letter from Clorite in January 2010 requesting that Norton stop such behavior.  D. 61 ¶¶ 17-20; D. 80 ¶¶ 17-20.  Clorite did not otherwise speak with any member of the SATV board but was concerned that such conduct would expose the SATV board to liability.  D. 61 ¶ 22; D. 80 ¶ 22.  Clorite believed that Tom Killoran ("Killoran"), Vice President of the SATV board, D. 61 ¶ 11; D. 80 ¶ 11, was otherwise made aware of the harassment, D. 61 ¶ 22; D. 80 ¶ 22.  Clorite believed that after January 2010 the harassment escalated.  D. 61 ¶ 23; D. 80 ¶ 23.  Between September 2009 and January 2011, Clorite kept personal notes of Norton's sexually harassing behavior and continued to speak with Breault regarding the situation.  D. 77 ¶¶ 22-23; D. 82 ¶¶ 22-23.

In April 2011, Breault filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") against SATV and Norton alleging sexual harassment.  D. 61 ¶ 24; D. 80 ¶ 24.  Clorite did not participate in MCAD's investigation.  D. 61 ¶ 25; D. 80 ¶ 25.  Clorite did not speak with any MCAD representative regarding the complaint or provide MCAD with any documents.  D. 61 ¶ 25; D. 80 ¶ 25.  In May 2011, the SATV board of directors, on behalf of

SATV, retained the Employment Practices Group ("EPG"), a legal and human resources consulting firm, to conduct an investigation regarding Breault's claims.  D. 61 ¶ 26; D. 80 ¶ 26. The president of EPG, Julie Moore ("Moore"), interviewed Clorite and Breault but the parties dispute if Moore interviewed other SATV employees and board members.  D. 61 ¶¶ 26-27; D. 80 ¶¶ 26-27.  Clorite provided to Moore a memorandum dated January 2010 from Clorite to Norton with the subject "Hostile Work Environment."  D. 61 ¶ 28; D. 80 ¶ 28.  Moore's report, dated July 13, 2011, concluded that Clorite had created the memorandum after the fact.  D. 61 ¶ 29; D. 80 ¶ 29.  Clorite disputes the facts, conclusions and admissibility of Moore's report.  D. 80 ¶ 29.[1]

Following the SATV board's receipt of Moore's report, Norton and Clorite were instructed not to attend the July 25, 2011 SATV board meeting.  D. 61 ¶ 33; D. 80 ¶ 33.  At the meeting, which Norton and Clorite did not attend, Moore's report was distributed to the board members. See D. 61 ¶ 33; D. 80 ¶ 33; D. 69-1 at 2 (July 25, 2011 SATV board minutes).  Upon review of Moore's report, the board unanimously approved a motion to place Breault on administrative leave with pay and benefits until August 31, 2011, at which time her pay and benefits would be terminated.  See D. 69-1 at 2.  The board also unanimously approved a motion to consider Clorite's status as a board member at the next meeting.  Id.  On February 12, 2012, Breault sent a request to MCAD to withdraw her complaint certifying that she had reached a satisfactory settlement.  D. 79-12 at 2.  On May 17, 2012, the SATV board held a meeting and voted to remove Clorite from

---

[1] Clorite filed a motion to strike Moore's report on the grounds that the report constituted, among other things, inadmissible hearsay and/or inadmissible opinion evidence and its admission would violate Fed. R. Evid. 403.  D. 85.  The Court, however, does not consider Moore's report for the truth of the matter asserted in deciding this motion.  Rather, the Court may consider Moore's report as to SATV's state of mind to the extent it relied upon it in its decision making.  See, e.g., Ira Green, Inc. v. Military Sales & Serv. Co., 775 F.3d 12, 18 (1st Cir. 2014).  Such evidence would be admissible at trial for this purpose and its probative value for this limited purpose would be outweighed by undue prejudice.  Fed. R. Civ. P. 56(c)(1)(B).  Accordingly, the motion to strike, D. 85, is denied.

the board.  D. 69-2 at 3; D. 61 ¶ 35; D. 80 ¶ 35.  Norton abstained from the vote.  D. 61 ¶ 36; D. 80 ¶ 36.  The board, in considering Clorite's removal, cited his lack of loyalty to the board and his breach of fiduciary duties by, among other things, failing to notify the board of Norton's actions that he considered to create a hostile work environment and of the untruthful testimony Norton provided to the board regarding a June 21, 2011 incident at the SATV studio.  D. 61 ¶ 35; D. 80 ¶ 35; D. 69-2 at 2-3.[2]

### B.    Clorite's Services for SATV and the Town of Somerset

Clorite last received compensation from SATV for his recording services in, at the latest, 2008, D. 61 ¶ 74; D. 80 ¶ 74, and otherwise received no compensation for his service as a SATV board member, D. 61 ¶ 75; D. 80 ¶ 75.  The parties dispute if Clorite ceased receiving compensation for his recording services from the Town of Somerset in 2008 or if he continues to receive a stipend for recording public meetings in the Town Hall.  D. 61 ¶ 76; D. 80 ¶ 76.

Although the parties dispute the number of recordings Clorite made, Clorite asserts that he submitted recordings of the Board of Selectmen and planning board meetings in disk form to SATV through, at the earliest, April 2013.  D. 61 ¶¶ 82-83; D. 80 ¶¶ 82-83.  Clorite also asserts that he submitted disks containing recordings of budget hearings and fiscal task force meetings through April 2015 and January 2015, respectively.  D. 80 ¶¶ 82-83.  In 2013, Clorite recorded Board of Selectmen and planning board meetings using equipment owned by the Town of Somerset for the dual purposes of broadcasting live programming over SATV and creating a DVD recording of the meetings for SATV to show as a repeat.  D. 61 ¶ 86; D. 80 ¶ 86.  In April 2013, as part of improvements to SATV's systems, SATV contracted with Leightronix to provide web-

---

[2] From what the Court can glean from the deposition of Lori A. Belche, an employee of SATV, this incident involved Breault and former SATV employee Joseph Perry.  See D. 79-17, Tr. 114:17-115:6; 128:23-130:15.

based video on demand services for the public to view shows and events previously recorded by SATV.  D. 61 ¶ 87; D. 80 ¶ 87.  The DVDs produced by Clorite using the Town of Somerset's equipment do not properly load on the Leightronix system to be made available to the public on demand.  D. 61 ¶ 90; D. 80 ¶ 90.  Starting in June 2013, SATV began to send its own crew to the Board of Selectmen and planning board meetings to record the meetings and make them available on demand.  D. 61 ¶ 91; D. 80 ¶ 91.  As such, Clorite utilized the Town of Somerset's cameras to broadcast the meetings live, whereas SATV utilized its cameras to record the meetings to play as repeats on SATV and make them available on demand.  D. 61 ¶ 92; D. 80 ¶ 92.  Although Clorite disputes the audio quality and composition of SATV's recordings, he does not dispute that SATV's recordings contain the same content as his recordings.  D. 61 ¶¶ 93-94; D. 80 ¶¶ 93-94.

Both SATV and Clorite continued to cover and record Board of Selectmen and planning board meetings until approximately May 2014 when those meetings were moved to the town library.  D. 61 ¶ 79; D. 80 ¶ 79.  SATV has installed numerous robotic cameras in the town library to record those meetings.  D. 61 ¶ 79; D. 80 ¶ 79.  As a result, Clorite does not bring over the Town of Somerset camera to broadcast or record those meetings.  D. 61 ¶ 79; D. 80 ¶ 79.

### C.    Clorite and the Diman Regional Vocational Technical School

From at least 2010 to 2013 Clorite recorded the graduation ceremonies for Diman Regional Vocational Technical School ("Diman").  D. 61 ¶ 40; D. 80 ¶ 40.  At the end of the 2013 school year Marta Montleon ("Montleon"), the Superintendent-Director at Diman since 2009, D. 61 ¶ 15; D. 80 ¶ 15, informed Clorite that Diman would no longer be using his videography services, D. 61 ¶ 41; D. 80 ¶ 41.  The A/V club at Diman would film all future school-related events.  D. 61 ¶¶ 41, 43; D. 80 ¶¶ 41, 43.  Montleon is not aware of any written agreement between Clorite and Diman regarding the recording of Diman events.  D. 61 ¶ 77; D. 80 ¶ 77.  The parties dispute whether

Montleon had a conversation with Norton in 2012 regarding Clorite's videographer skills or equipment and whether Norton improperly influenced Montleon's decision to have the A/V club record school events.  D. 61 ¶¶ 42-44; D. 80 ¶¶ 42-44; D. 67 ¶ 19 (Montleon Aff.).

### D.    Norton's Statements Regarding Clorite

Clorite asserts that between 2010 and 2013 Norton made various comments to others regarding his competency as a videographer or his service on the SATV board.  D. 61 ¶¶ 46, 50, 52, 54-55, 57, 69; D. 80 ¶¶ 46, 50, 52, 54-55, 57, 69.  While the parties dispute what was said, D. 61 ¶ 55; D. 80 ¶ 55, the only specific comments made by Norton were made in the presence of Donald Setters ("Setters"), a Board of Selectmen member, D. 61 ¶ 53; D. 80 ¶ 53, in February 2013, D. 61 ¶ 55; D. 80 ¶ 55; D. 79-18 ¶ 19 (Setters Aff.), and also at the December 4, 2013 Board of Selectmen meeting, D. 61 ¶ 57; D. 80 ¶ 57.  Norton commented that Clorite was "incompetent, "didn't know what he was doing" and was a "piece of shit."  D. 80 ¶ 55; D. 79-18 ¶ 19.  At the December 2013 meeting, D. 81, Norton commented that Clorite had contributed to an earlier broadcasting issue on November 20, 2013.  D. 61 ¶ 57; D. 80 ¶ 57; D. 79-19 ¶ 15.  At some point, Norton also purportedly said that Clorite "doesn't know what he is doing."  D. 79-19 ¶ 9.

## IV.    Procedural History

On December 9, 2014, this Court granted in part and denied in part Defendants' motion to dismiss and denied Defendants' motion to strike.  D. 36.  Pursuant to this Court's Memorandum and Order, certain of Clorite's claims survived:  retaliation pursuant to Mass. Gen. L. c. 151B (Count I) (against both Defendants); defamation (Count III) (against both Defendants); interference with advantageous business or contractual relationships (Count IV) (against Norton only); and violation of free speech rights under the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights (Count VI) (against SATV

only) survived.  Id.  Following Defendants' answer and counterclaims, Clorite has now moved for partial summary judgment on Defendants counterclaims, D. 58, and Defendants have now moved for summary judgment on all remaining counts against them, D. 60.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 86.

## V.  Discussion

### A.  Retaliation Under Mass. Gen. L. c. 151B (Count I, Against SATV and Norton)

Clorite asserts that SATV and Norton retaliated against him by terminating him from the SATV board and refusing to broadcast his live recordings on demand because he reported that Norton sexually harassed Breault and aided in the MCAD complaint and investigation.  D. 79 at 5-6; D. 14 ¶¶ 67-71.  Given the burden-shifting framework, at the first stage, Clorite must demonstrate a *prima facie* case of retaliation by proffering evidence that:  (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.  See Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005).  If Clorite satisfies his burden at the first stage, the burden shifts to Defendants at the second stage to articulate legitimate, nondiscriminatory reasons for the adverse employment action.  Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 681 (2016).  Assuming Defendants satisfy their burden, the burden shifts back to Clorite at the third and last stage to show that Defendants' articulated reasons are pretextual.  Id. (explaining that "Massachusetts is a pretext only jurisdiction" (citation omitted)).  To show pretext on a motion for summary judgment Clorite "need[s] only [to] present evidence from which a reasonable jury could infer that 'the [Defendants'] facially proper reasons given for its action against [Clorite] were not the real reasons for that action.'"  Id. at 682 (citation omitted).

As to the first stage, Clorite asserts that he engaged in protected conduct by providing a letter to Norton in January 2010 regarding the purported sexual harassment Norton engaged in against Breault and by assisting in the investigation by Moore. D. 79 at 5-6. [3]  While the parties contest whether Norton ever received that letter, they do not contest that the January 2010 letter was only sent to Norton and not to any other member of the SATV board. D. 61 ¶¶ 17-22; D. 80 ¶¶ 17-22.  Although Clorite "believed that Ms. Breault's harassment concerns had been reported to" Killoran, D. 80 ¶¶ 19, 22, such an assertion is based upon Breault's affidavit, stating that in the "autumn of 2010" her attorney—and not Clorite—informed Killoran that "allegations of sexual harassment were being raised against Mr. Norton," D. 79-8 ¶ 27.  The members of SATV's board, however, were made aware of Clorite's January 2010 letter when Clorite provided it to Moore and it was discussed in her July 13, 2011 report.  D. 61 ¶¶ 28-29; D. 80 ¶¶ 28-29.  Clorite has thus satisfied the first element regarding protected activity and, at least for the purposes of the consideration of this motion, the Defendants assume, without conceding, that Clorite experienced an adverse employment action by being removed from the SATV board on May 17, 2012 or by SATV failing to air certain of his recordings.  D. 61 ¶ 37; D. 80 ¶ 37; D. 72 at 18-19.

Defendants' motion succeeds, however, as to the third element, causal link.  Inevitably Clorite must show that his protected conduct was a "but-for" cause of the allegedly adverse acts against him.  See Ponte v. Steelcase Inc., 741 F.3d 310, 321 & n.9 (1st Cir. 2014) (applying the "but for" standard to retaliation claims under both Title VII and c. 151B); see Lipchitz v. Raytheon Co., 434 Mass. 493, 505 (2001).  As such, the evidence presented must "enable a rational factfinder reasonably to infer that [retaliation] was a determinative factor in the adverse employment action."

---

[3] The Court notes that Defendants "assume that Clorite has met his burden to show that he engaged in protected activity because of his participation in Ms. Moore's harassment investigation in May 2011." D. 72 at 18 n.3.

Weeks v. Lower Pioneer Valley Educ. Collaborative, No. 14-cv-30097-MGM, 2016 WL 696096,

at *9 (D. Mass. Feb. 19, 2016) (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir.

1999)) (internal quotation mark omitted).

Regarding Defendants' failure to make Clorite's live recordings available on demand, as

early as April 2013, as alleged by Clorite, D. 80 ¶ 83,  as a retaliatory act, the parties do not dispute

that the DVD recordings created by Clorite did not properly load on the Leightronix to be provided

to the public on demand, D. 61 ¶ 90; D. 80 ¶ 90, and that starting sometime in May 2014, the Board

of Selectmen and planning board meetings were recorded using robotic cameras in the town

library, D. 61 ¶ 79; D. 80 ¶ 79.  Absent other evidence, including any temporal proximity, no

rational factfinder could conclude that "but-for" Clorite's protected conduct, his recordings would

have been available on demand.

As to Clorite's termination from the SATV board, the board received the Moore report

indicating Clorite's protected conduct in July 2011.  D. 62-1 (Moore report); D. 61 ¶ 30; D. 80 ¶

30.  While at the July 25, 2011 meeting, which Norton and Clorite did not attend, the board

unanimously approved a motion to consider Clorite's status as a board member at the next meeting.

D. 69-1 at 2; D. 61 ¶ 31; D. 80 ¶ 31.  Clorite, however, was not removed from the board until May

2012 and Norton abstained from the vote on that decision.  D. 69-2 at 2-4; D. 61 ¶ 36; D. 80 ¶ 36.

Aside from Clorite's recordings not being used, as discussed above, there is no other evidence

suggesting that Clorite's employment with SATV did not remain "substantially intact."  Mesnick

v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991).  Considering the eleven month "long gestation

period," id.,  between the SATV board becoming aware of Clorite's protected conduct and his

2012 termination, a reasonable factfinder could not conclude that retaliation was a determinative

factor in that decision.  Indeed the First Circuit has found periods of time as short as two months,

Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 85 (1st Cir. 2005) (affirming summary judgment for defendant where two month period in between plaintiff's protected activity and termination, standing alone, was insufficient to establish a causal link), and as long as eight or more months, Morón-Barradas v. Dep't of Educ. of Commonwealth of P.R., 488 F.3d 472, 481 (1st Cir. 2007) (affirming summary judgment in defendant's favor where eight months between plaintiff's protected activity and the adverse employment act was insufficient to establish temporal proximity), to be insufficient to establish causality.  Clorite has, therefore, failed to make out a *prima facie* case of retaliation and his claim fails.

Even assuming *arguendo* that Clorite demonstrated a *prima facie* case, he cannot establish pretext.  In consideration of the Moore report and of Clorite's admissions therein, the SATV board based Clorite's termination upon, among other reasons, Clorite's failure to notify the board of the alleged sexual harassment he knew of, at the latest, in January 2010, D. 61 ¶¶ 16-17; D. 80 ¶¶ 16-17, but concealed, D. 61 ¶ 22; D. 80 ¶ 22, and the untruthful testimony he provided to the board regarding the June 21, 2011 incident,[4] D. 69-2 at 2-3; cf. Gómez–González v. Rural Opportunities, Inc., 626 F.3d 654, 662-663 (1st Cir. 2010) (noting that pretext can be established by "weaknesses" or "implausibilities" in the proffered reasons for the adverse employment action).  For this reason Clorite's claim also fails.

Accordingly, the Court ALLOWS Defendants' motion for summary judgment as to Clorite's Mass. Gen. L. c. 151B claim (Count I).

---

[4] While Clorite asserts that the board cited "various untruths" in its decision to terminate him, he does not point to any evidence that his testimony to the SATV board regarding the incident was true.  See D. 61 ¶ 35; D. 80 ¶ 35 (in the portion of Clorite's affidavit he cites to, see D. 79-1 ¶¶ 21-27, he admits of his knowledge of the harassment by January 2010 and does not address the June 2011 incident).

B.    **Defamation (Count III, Against SATV and Norton)**

In this Court's prior decision, it noted that the statute of limitations for a claim of defamation is three years, see Mass. Gen. L. c. 260, § 4, and that because Clorite commenced this action on January 23, 2014, the Court may only consider those allegedly defamatory statements made by the Defendants published after January 23, 2011.  D. 36 at 9.  To succeed on his defamation claims Clorite must show:  (1) Defendants made a statement to a third party that concerned him; (2) the statement was defamatory in that it could damage Clorite's reputation in the community; (3) Defendants were at fault in making the statement; and (4) the statement either caused economic loss or is actionable without economic loss.  See Walker v. President & Fellows of Harvard Coll., 82 F. Supp. 3d 524, 532 (D. Mass. 2014) (quoting Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012)).  It is well established, however, that "neither true statements nor 'pure' expressions of opinion, meaning those that do not imply the existence of undisclosed facts, are actionable." Piccone v. Bartels, No. 11-cv-10143-MLW, 2014 WL 4180804, at *1 (D. Mass. Aug. 25, 2014).  "[D]efamation requires a false statement at its core." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015).

Clorite focuses on the comments made to or in the presence of Setters and Lebeau, D. 79 at 15, both members of the Board of Selectmen, D. 79-18 ¶ 2; D. 79-19 ¶¶ 3-4.  The only substantiated, published comments Clorite points to are those made by Norton at the February 19, 2013 Somerset Economic Development Committee conference, D. 80 ¶ 55; D. 79-18 ¶ 19, and at the December 4, 2013 Board of Selectmen meeting, D. 80 ¶ 57; D. 81; D. 79-19 ¶ 15.  Specifically, in February 2013, Norton allegedly called Clorite "'incompetent,' said that he 'didn't know what he was doing,' that he was a 'piece of shit,' and that his work was not good." D. 80 ¶ 55; D. 79-18 ¶ 19.  At the December 2013 meeting, Norton allegedly criticized Clorite, blamed him the for

broadcast issue being discussed, stated that a "high school kid" could do a better job and accused Clorite of trying to damage a computer due to the misplaced labels on his DVD recordings submitted to SATV.  D. 80 ¶ 57; D. 81.  While Lebeau states that there were other instances when Norton made comments about Clorite's skills as a videographer, D. 79-19 ¶¶ 8, 10, the only specific comment he can recall—made at an unspecified time—is that Norton stated out loud that "that person over there behind the one camera doesn't know what he is doing" and Lebeau asserts that Norton was referring to Clorite, id. ¶ 9.  Defendants do not appear to contest that these statements were made but assert that the statements do not constitute defamation.  D. 83 at 7-8.  Examining the statements "in [their] totality in the context in which [they] [were] uttered or published," Foley v. Lowell Sun Publ'g Co., 404 Mass. 9, 11 (1989) (citation omitted), however, the Court concludes that none of Norton's statements are actionable.

The statements made by Norton in February 2013, or at other unspecified times, are expressions of opinion and exaggeration.  Indeed, these generalized statements by Norton—while certainly offensive to the ear—regarding Clorite's competence and quality of work cannot be measured as true or false because they lack specificity.  See Cole v. Westinghouse Broad. Co., 386 Mass. 303, 312 (1982) (discussing how "[w]hether a reporter is sloppy and irresponsible with bad techniques is a matter of opinion" because "[t]he meaning of these statements is imprecise and open to speculation" and "cannot be characterized as assertions of fact" as "[t]hey cannot be proved false"); see also Judd v. McCormack, 27 Mass. App. Ct. 167, 174 (1989) (employer's statement that the reason for plaintiff's termination was her failure to show the "psychological and physiological skills necessary to perform effectively as a firefighter" was a statement of opinion). Norton's statements are "more conclusory than factual" and amount to nothing more than his opinion of Clorite and his work.  See Judd, 27 Mass. App. Ct. at 174.

Similarly, the recording of the December 2013 Board of Selectmen meeting, D. 81, Norton's statements regarding the broadcast outage were not definitive in attributing the cause of the broadcast outage to Clorite and are thus not actionable.  Norton's comments about Clorite's potential contribution to the broadcast outage were made in attempting to discern the actual cause of the issue and not as an assertion of fact.  See id.  Indeed, Norton's statements cannot be proven true or false as everyone engaged in the discussion at the meeting, including Clorite and Norton, appeared to conclude that there is no way to tell what caused the outage and that perhaps Clorite and SATV could both take different steps in the future to prevent such an outage.  See id.  While Clorite asserts that Norton stated that Clorite misplaces labels on his DVD recordings provided to SATV in an attempt to damage a $1,500 computer, D. 80 ¶ 57, the recording of the meeting indicates that this comment was actually made by an unidentified female at the meeting concerned about the crooked labels potentially damaging her computer.  D. 81 at 25:00-25:37.  Additionally, Clorite asserts that Norton commented that a "high school kid" does a better job than Clorite, D. 80 ¶ 57, but the recording indicates that Norton was stating that that high schooler's recording is what ends up on demand due to the technical issues with the DVD recordings Clorite creates.  Id. at 13:15-13:32.  Those statement actually made by Norton regarding Clorite, however, are expressions of opinion and are thus not actionable.

Moreover, even assuming that such statements were actionable, there is no evidence that Clorite suffered any loss stemming from the statements.  Under Massachusetts law, "[f]our types of statements are actionable without proof of economic loss: statements that constitute libel . . . ; statements that charge the plaintiff with a crime; statements that allege the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business."  Alharbi v. Beck, 62 F. Supp. 3d 202, 206 (D. Mass. 2014) (quoting Ravnikar v. Bogojavlensky, 438 Mass.

627, 630 (2003)) (internal quotation marks omitted).  If a defamatory statement falls within one of

these four categories, "a plaintiff may recover noneconomic losses, including emotional injury and

damage to reputation."  Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003) (citations omitted);

Dexter's Hearthside Rest., Inc. v. Whitehall Co., 24 Mass. App. Ct. 217, 220 (1987) (noting that

"[i]n the case of an individual, compensatory damages comprehend mental anguish,

embarrassment, and humiliation").

There is no evidence that Clorite experienced any economic loss as a result of the purported

statements.  While Clorite points to Diman discontinuing its relationship with him as an economic

injury, D. 79 at 15; D. 79-1 ¶ 36, there is no evidence refuting Montleon's statement that Diman

made its decision because of the creation of the A/V club rather than the purportedly defamatory

statements made by Norton.  D. 67 ¶¶ 18-20.  Clorite does not otherwise point to other actual or

potential economic losses he may have suffered.  D. 79 at 15-16.  The noneconomic injuries Clorite

raises following the December 2013 meeting, D. 79 at 14-15—being made fun of, being contacted

by unidentified people who made unspecified negative statements about him, and his medical

issues, D. 61 ¶¶ 60-67; D. 80 ¶¶ 60-67, are speculative at best, D. 72 at 16.  While Clorite asserts

that he received a text message from Cheryl Crosby-Simmons regarding the December 2013

meeting, he admits that he could not say whether his relationship with her was better or worse

following that meeting.  D. 61 ¶¶ 59, 61; 80 ¶¶ 59, 61.  There are otherwise no facts presented

regarding his relationship with those unspecified individuals who contacted him after that meeting,

despite Clorite asserting that he found their statements offensive.  D. 61 ¶¶ 63-64; 80 ¶¶ 63-64.

Accordingly, the Court ALLOWS Defendants' motion for summary judgment as to

Clorite's defamation claim, Count III.

C.     **Interference with Advantageous Business or Contractual Relationship (Count IV, Against Norton)**

For Clorite to succeed on his claim of interference with an advantageous business or contractual relationship against Norton he must show that:   (1) "he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship)"; (2) Norton "knowingly induced a breaking of the relationship"; (3) Norton's "interference with the relationship, in addition to being intentional, was improper in motive or means"; and (4) Clorite was harmed by Norton's actions.  Blackstone v. Cashman, 448 Mass. 255, 260 (2007).  Clorite, however, fails to present sufficient evidence to raise a triable issue of fact as to whether Norton, acting individually, and not on behalf of SATV, interfered with Clorite's relationship with SATV and Diman.  See Riseman v. Orion Research Inc., 394 Mass. 311, 314 (1985) (affirming summary judgment because defendant could not be liable for interference with its own relationship).

Clorite asserts that Norton interfered with his relationship with SATV by causing SATV to terminate him from the board and to discontinue the use of his recordings.  As discussed, *supra*, Norton was not involved in SATV's decision to terminate Clorite and there are no facts giving rise to a triable issue as to whether Norton otherwise influenced SATV's relationship with Clorite.  D. 61 ¶ 36; D. 80 ¶ 36.  Notably, the reasons the SATV board cited in terminating Clorite are not refuted by the evidence in the record.  Clorite also cannot show that he suffered any harm from Norton's alleged actions.   Based upon the record, SATV discontinued its use of Clorite's recordings, not because of any action or influence by Norton, but because the Leightronix system for on demand broadcasts was incompatible with the Town of Somerset's equipment that Clorite used.  D. 61 ¶ 90; D. 80 ¶ 90.

Likewise, unrefuted evidence establishes that Diman, starting after the 2013 school year— years after Clorite's termination from SATV's board—discontinued its use of Clorite to record its

17

graduation ceremonies and other school events due to the creation of an A/V club.  D. 61 ¶ 43; D. 80 ¶ 43; D. 67 ¶¶ 18-20.  Regardless of whether, as Clorite asserts, Norton spoke with Montleon in 2012 regarding Clorite's competency as a videographer, based upon Montleon's explanation that she wanted to provide an opportunity for the students of Diman in the A/V club to hone their interest in videography, D. 67 ¶¶ 10-20, no reasonable fact finder could conclude that Diman stopped using Clorite to record its graduation ceremonies because of Norton's conduct.  Clorite does not present evidence to contradict Montleon's statement that it was her decision alone to cease using Clorite's services in light of the new A/V club and that she did not recall having a conversation with Norton in 2012 to discuss Clorite.  Id. ¶¶ 18-20.  Clorite thus fails to show that Norton induced a break in Clorite's relationship with Diman or that he caused any harm to Clorite where there is no evidence that Diman's decision was based upon or influenced by Norton.

Accordingly, the Court ALLOWS Norton's motion for summary judgment on Clorite's claim for interference with an advantageous business relationship, Count IV.

## F.    Freedom of Expression (Count VI, Against SATV)

Clorite asserts that SATV violated his freedom of expression and First Amendment rights when it did not air his recordings of certain public meetings and the 2012 Diman graduation ceremony.  D. 14 ¶ 124; D. 79 at 19; D. 80 ¶ 42.[5]  This Court previously focused on the "state actor" requirement for such a claim in determining whether it could stand against SATV.  Clorite v. Somerset Access Television, Inc., No. 14-cv-10399-DJC, 2014 WL 6983350, at *9-10 (D. Mass.

---

[5] The Court notes that, in his opposition, Clorite asserts that SATV refused to air certain content submitted by others.  D. 79 at 17.  These allegations are not in his amended complaint and thus do not form the basis of his suit against SATV.  D. 14 ¶¶ 119-127.  Even then, it is unclear if Clorite would have standing to peruse those claims on their behalf.

Dec. 9, 2014).[6]  In discussing the three factors set forth in Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 399 (1995)—(1) "the government created the corporation;" (2) "for the furtherance of governmental objectives;" and (3) "retain[ed] for itself permanent authority to appoint a majority of the directors"—this Court recognized that the First Circuit in Barrios-Velázquez v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 492 (1st Cir. 1996), in applying those factors, "focused on the degree of control."  See Clorite, 2014 WL 6983350, at *9 (internal quotation marks omitted).  Accordingly, the Court denied Defendants' motion to dismiss where Clorite sufficiently alleged that "the town of Somerset retains the ability to appoint at least some members of the SATV board."  Id.

Based upon the record as it stands now, however, the Town of Somerset did not have a sufficient degree of control over SATV to render it a state actor when SATV purportedly violated Clorite's freedom of expression through April 2015, the last date he purportedly submitted his recordings to SATV.  D. 80 ¶ 83.  Although when SATV was first created the Board of Selectmen appointed the entire SATV board, D. 61 ¶ 3; D. 80 ¶ 3; D. 79-15 at 107:9-108:24; D. 70-6 at 4, the SATV bylaws clearly provide that, as seats on the board become available, only two of the five to seven seats are appointed by the Board of Selectmen, D. 70-6 at 4; D. 61 ¶ 3; D. 80 ¶ 3.  As such, the Town of Somerset, through the Board of Selectmen, would not have majority control over SATV.  This case is thus unlike Demarest v. Athol/Orange Cmty. Television, Inc., 188 F. Supp. 2d 82, 91 (D. Mass. 2002) where the court concluded that a public-access channel was a state actor because the station's Board of Selectmen retained the authority "to appoint *all*—not just a

---

[6] The Court notes that, to the extent Clorite continues to pursue state claims, "[t]he Mass. Decl. of Rights is generally coextensive with the federal constitution when it comes to the freedom of expression, and thus a breach of the latter constitutes a breach of the former."  Flaherty v. Knapik, 999 F. Supp. 2d 323, 332 (D. Mass. 2014) (citations omitted).  Clorite has not otherwise asserted that those protections apply differently to his claims.  D. 79 at 16-20.

majority—of the members of the 'Access Group,' which manage[d] and operate[d] [the station]."
Here, SATV, during the applicable time, could not have been majority controlled by the Board of
Selectmen.  D. 70-6 at 4.

Additionally, prior to the July 2015 change in SATV's budget approval process,[7] SATV
was funded by a certain percentage of the remittances from Comcast, as well as public donations,
such that the Town of Somerset did not have direct control of SATV's budget.  D. 61 ¶ 5; D. 80 ¶
5; D. 79-19 ¶ 18.  There are no facts suggesting that the Town of Somerset "subsidized the losses"
of SATV, see Barrios-Velázquez, 84 F.3d at 492 (noting that the government did not subsidize [an
association's] losses, unlike in Lebrón), such that the Town of Somerset could assert indirect
control over SATV through its finances.  While after July 2015 SATV would have to seek approval
for its budget request from the Town of Somerset before the Board of Selectmen, the Court does
not opine on whether that transformed SATV into a state actor from that point on.  See  D. 70-8
(Opinion of the Attorney General dated Oct. 6, 2010 (determining that Winchester Community
Access & Media, a local cable access station, is not a "public body" and does not perform an
"essentially government function" that would subject it to the Open Meeting Law, M.G.L. c. 30A,
§§ 18-25)).  Clorite's claim thus fails where SATV was not a state actor when it purportedly
violated Clorite's First Amendment rights through April 2015.  See Barrios-Velázquez, 84 F.3d at
492.

Even assuming SATV was a state actor, "courts have routinely held that public access
channels are not First Amendment 'public forums' for the purposes of state action."  Morrone v.
CSC Holdings Corp., 363 F. Supp. 2d 552, 558 (E.D.N.Y. 2005) (collecting cases); accord

---

[7] Starting in July 2015, based upon the new license with Comcast, SATV must present their
budget to the Board of Selectmen for approval.  D. 80 ¶ 5; D. 79-19 ¶¶ 19-20.

Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 675 (1998) (discussing how "in most cases, the First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming" and concluding that a debate hosted by a public television station was a nonpublic forum).  The Supreme Court has observed, however, that "[t]o be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." Arkansas Educ. Television Comm'n, 523 U.S. at 682 (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985)).

Based upon the record before the Court, no rational factfinder could conclude that SATV's exclusion of Clorite's recordings was based upon his viewpoint or was unreasonable.  While Clorite asserts that, per SATV's operating agreement, "all submitted content will be broadcast [sic] unless it contains a narrow band of offensive material prohibited over the public airwaves (nudity, obscenity, etc.)," D. 79 at 16; see D. 79-13 at 20-22, the agreement reserves SATV's right "[t]o cablecast the program as often as is deemed appropriate," D. 79-13 at 22.  The exclusion of Clorite's recordings—regardless of the purported quality of SATV's recordings of the same, D. 79 at 20 n.6—was clearly reasonable and not based upon Clorite's viewpoint in light of the technical issues with the on demand system discussed above, D. 61 ¶ 90; D. 80 ¶ 90.  There is no triable issue of fact as to whether the exclusion was viewpoint based where the open meetings Clorite filmed with the Town of Somerset's camera were still broadcast live.  D. 61 ¶¶ 85, 93-94; D. 80 ¶¶ 85, 93-94; see Glendora v. Hostetter, 916 F. Supp. 1339, 1341-42 (S.D.N.Y. 1996), aff'd, 104 F.3d 353 (2d Cir. 1996) (concluding that a reduction in airtime for "a producer of a public access program" due to "the great demand for public access channel time" and in light of the public access station's discretion under the operating rules was not sufficient to establish a cognizable

First Amendment or Cable Act claim).  Likewise, there is no evidence in the record regarding the reason for the exclusion of the 2012 Diman graduation recording, D. 80 ¶ 42; D. 67 ¶ 18, from which a factfinder could conclude that its exclusion was unreasonable or viewpoint dependent. This is especially true given the time constraints inherent in making programming decisions and that Clorite does not assert that the recording of the Diman graduation ceremony had any viewpoint or message.  See Glendora, 916 F. Supp. at 1341-42.  Lori Belche, involved in operations at SATV, D. 64 ¶ 2, asserts that the Diman graduation was not played by SATV because of its poor quality and Clorite's failure to submit a "Broadcast Request Form," id. ¶¶ 7-8.  While Clorite disputes whether he submitted certain forms along with his recordings to SATV, he asserts that such forms are not required for government meetings but does not address programs such as the Diman graduation.  D. 61 ¶ 84; D. 80 ¶ 84.  As such, there is no evidence to support an actionable violation of Clorite's First Amendment rights.

Accordingly, the Court ALLOWS SATV's motion for summary judgment as to Count VI.

**G.      Counterclaims Against Clorite**

*1.      Breach of Fiduciary Duty*

SATV asserts a counterclaim against Clorite for breach of fiduciary duty (Count I) by failing to notify the SATV board of Norton's purported sexual harassment of Breault.  D. 48 at 21. To satisfy the elements of a claim for breach of fiduciary duty, a plaintiff must allege:  (1) "existence of a fiduciary duty arising from a relationship between the parties"; (2) "breach of that duty"; (3) "damages"; and (4) "a causal relationship between the breach and the damages."  Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005).  The parties appear to focus on the second element, as to whether Clorite's failure to warn or notify SATV regarding known sexual harassment constituted a breach of fiduciary duty.  D. 73 at 7; D. 76 at 10-13.  A breach can occur

when a fiduciary fails to disclose any information relevant to a decision-maker thereby preventing the decision-maker from exercising his or her informed judgment.  See, e.g., Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 434 (1st Cir. 1996).

The parties contest whether Clorite ever notified Norton in January 2010 regarding his sexual harassment of Breault, D. 61 ¶¶ 17-19, 25; D. 80 ¶¶ 17-19, 25, but Clorite admits that he knew, as early as late 2009, of the sexual harassment of Breault, and kept notes regarding such conduct, D. 61 ¶ 16; D. 80 ¶ 16; D. 77 ¶ 22; D. 82 ¶ 22.  Indeed, Clorite was concerned about the liability such conduct could impose on the SATV board, yet promised Breault to not tell other SATV board members.  D. 61 ¶ 22; D. 80 ¶ 22; D. 77 ¶¶ 20, 28, 31; D. 82 ¶¶ 20, 28, 31.  These alleged facts properly raise a triable issue of fact as to whether Clorite ever notified Norton—assuming notifying the individual who is the purported cause of the problem is sufficient—let alone any other SATV board members regarding the conduct at issue, and thus whether such a failure was a breach of his fiduciary duty to SATV.  In re Access Cardiosystems, Inc., 340 B.R. 127, 150 (Bankr. D. Mass. 2006) (concluding that a fiduciary's failure to protect the corporation from his own self-interest was a breach).

SATV distinguishes the cases Clorite relies upon, D. 76 at 13-15 where the allegations were insufficient to overcome the protections of the business judgment rule.  That is, there is a question of fact as to whether Clorite informed Norton, but not any other member of the SATV board, of the purported harassment and thus whether the SATV board knew of the harassment earlier to act upon it.  The cases cited, In re American Apparel, Inc. Shareholder Derivative Litigation, No. 10-cv-06576, 2012 WL 9506072 (C.D. Cal. July 31, 2012) and In re Abbott Laboratories Derivative Shareholders Litig., 325 F.3d 795 (7th Cir. 2003), are therefore inapplicable because in those cases there were allegations that the respective boards knew of the

harassment or regulatory non-compliance at issue, triggering the protections of the business judgment rule.  By contrast, many of the facts asserted by Clorite indicate that the sexual harassment was well known to him—but not necessarily to the SATV board to allow it to act— and such harassment ultimately culminated in a MCAD complaint, internal investigation and settlement.  Accordingly, Clorite's motion is DENIED as to SATV's Count I.

2.   *Breach of Confidentiality Agreement*

SATV does not oppose Clorite's motion for summary judgment as to its counterclaim for breach of a confidentiality agreement, Count II.  D. 48 at 22; D. 76 at 15.  Accordingly, Clorite's motion is ALLOWED as to SATV's Count II.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 60, as to all remaining counts asserted by Clorite and ALLOWS IN PART and DENIES IN PART Clorite's motion for partial summary judgment, D. 58.  Clorite's motion is allowed as to SATV's Count II.  Accordingly, the only claim that remains for trial is SATV's counterclaim against Clorite for breach of fiduciary duty (Count I).

**So Ordered.**

/s/ Denise J. Casper
United States District Judge